NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia


Decided: March 4, 2025


S24A1101.  RYALS v. THE STATE.


BOGGS, Chief Justice.

Appellant Charvez Ryals appeals from his convictions for malice murder and other crimes in connection with the beating and fatal shooting of Daniel Wise.[1] Appellant contends that trial counsel

---

[1] The crimes occurred on March 10, 2018. On June 7, 2018, a DeKalb County grand jury indicted Appellant for malice murder; two counts of felony murder (based on aggravated assault and possession of a firearm by a convicted felon); two counts of aggravated assault against Wise, one for assaulting him with a deadly weapon and one for striking him with a handgun; one count of aggravated assault against Robbie Johnson; one count of aggravated assault against Ka.W.; one count of aggravated assault against Ke.W.; two counts of cruelty to children in the second degree; four counts of possession of a firearm during the commission of a felony; and possession of a firearm by a convicted felon. At a trial from October 24 to October 31, 2019, a jury found Appellant guilty on all counts of the indictment. On November 4, 2019, the trial court sentenced Appellant to serve life in prison for malice murder, to 20 concurrent years in prison for the count of aggravated assault against Wise predicated on striking him with a handgun, to concurrent terms of 20 years in prison for the aggravated assaults of Johnson, Ka.W., and Ke.W., to concurrent terms of ten years in prison for both counts of cruelty to children, and to consecutive terms of five years in prison for each of the five firearm offenses. The felony murder counts were vacated by operation of law, and the

provided constitutionally ineffective assistance by failing to subpoena a witness, by failing to investigate and procure phone records, by failing to introduce the criminal history of Wise and Robbie Johnson, who was a victim who testified at trial, and by failing to request a jury charge on voluntary manslaughter. For the reasons set forth below, we conclude that these claims of ineffective assistance fail. Accordingly, we affirm.

At the time of the crimes, which occurred shortly before noon on March 10, 2018, Regina Welch and Appellant lived in an apartment on Chupp Road in DeKalb County. They had been dating about a year and a half and had one child together. Before her relationship with Appellant, Regina had dated Wise for 13 years. They had three children together, Ka.W., Ke.W., and D.W. The three siblings primarily lived with Wise or his mother, and Wise would

trial court merged one of the aggravated assaults of Wise for purposes of sentencing. Appellant filed a timely motion for new trial, which he amended with new counsel on February 2, 2022. On March 18, 2024, the trial court denied the motion for new trial, as amended. Appellant filed a timely notice of appeal, and the case was docketed to this Court's August 2024 term and submitted for a decision on the briefs.

drive them to Regina's apartment for weekend visits, as Regina did not have a car. Regina described her relationship with Wise as a "violent" one. In addition to her testimony of Wise's violence toward her on the night of the crimes, she testified that, during an earlier incident at which Appellant was present, Wise had first "smushed [her] face" and then "grazed [her] face." Regina added that Wise had also previously threatened to "shoot [her] house up." Regina added that Appellant was aware of the "prior violence."[2]

On the night before the murder, Regina and Appellant were at home, while Ka.W. and Ke.W. stayed at the home of Regina's mother, Pamela Benton. Wise came by Regina's home about 3:00 a.m., and Regina and Appellant went outside to ask Wise what he was doing there. Wise said that he was there because Regina owed him some money based on tax credits related to their three children. In response, Regina said that she did not owe Wise any money, and the confrontation escalated, which led to Wise "punch[ing]" Regina

---

[2] The trial court limited evidence about Wise's violence toward Regina to the time frame in which Regina and Appellant were dating.

3

in the face. Appellant then told Wise not to "put [his] hands" on Regina, and Appellant and Wise began fighting each other. Neighbors heard the fight and came outside and broke it up. Wise, however, refused to leave for about an hour, and after he did, he called Appellant about 5:00 a.m. that same morning, and Regina recorded the call.

Later that morning, Regina drove to a nearby Chevron gas station where she met her mother, Benton, who was bringing Ka.W. and Ke.W. back to Regina's home. From the gas station, Regina, with Benton following, drove to see Appellant, who was visiting someone at an apartment complex that was across Chupp Road from Appellant's apartment. Regina spoke with Appellant, who told her that Wise was parked in front of her apartment. According to Regina, Appellant was angry because Wise "had been threatening him all morning," starting with the phone call at 5:00 a.m.

Regina told Appellant to stay at the neighboring apartment complex, and she, her mother, and her children, drove to her apartment, where Wise and his co-worker, Robbie Johnson, were

4

waiting. Once Regina parked, Wise approached her car and was "cussing and stuff." Regina told Wise to leave, but he did not do so and put both of the children in the back seat of his car. According to Regina, Wise was "talking all this smack" and said that he was there "to see that . . . dude of yours dead." Wise went to talk to Regina's mother; Regina got out of her car and began talking to Johnson, who was sitting in the front passenger seat of Wise's Suburban and had a gun in his lap.

At this point, Appellant arrived on the scene using a path from the neighboring apartment complex. Regina saw him walk "around the front of [her] mom's car." Appellant, who was holding a black gun, told Wise that he had told Wise "to stay . . . away from [his] family." Wise "lifted up his shirt and showed his gun," and Appellant "hit [Wise] with [his] gun" "in the side of the head." Wise then tried "to go for [Appellant's] gun again" and Appellant hit him again. According to Regina, Wise kept coming at Appellant, and Appellant stepped back and shot Wise, firing "more than five" shots. Although Regina testified that Wise "pull[ed] his shirt up," she added that he

5

never had his gun in his hands; it was in the waist of his pants. Johnson then tried to get out of Wise's Suburban and "shoot at [Appellant]," but Appellant saw him and shot him in the back. After the shooting stopped, Appellant went through the path toward the neighboring apartment complex. Regina reiterated that Wise did not pull a gun on anyone that morning and did not hit her.

Several other witnesses also testified about the shooting. Contrary to Regina's testimony, Johnson testified that neither he nor Wise had a gun during the incident. He added that, when Regina and Benton arrived with the children, Regina began arguing with Wise, who was calm, about a disagreement that had occurred the night before between Regina, Appellant, and Wise. Shortly after the children got out of Regina's car and sat in the backseat of Wise's Suburban,[3] Appellant arrived at the scene and said to Wise, "Didn't I tell you not to come back over here." Appellant, who had a black handgun, hit Wise with the gun. Appellant and Wise "tussel[ed]

---

[3] D.W. had spent the night at a friend's house and was not present at the time of the crimes.

6

with the gun in the air." According to Johnson, Appellant, who was taller than Wise, was shooting down at Wise and fired "a lot" of shots. At one point, Wise fell to the ground, and Appellant turned his attention to Johnson, who had stayed in the passenger seat of Wise's Suburban. Appellant asked Johnson if he was with Wise and fired "about three" shots toward the Suburban, which was occupied by Ka.W. and Ke.W. in addition to Johnson. Johnson was struck in the back by one of the shots. Johnson looked toward Appellant and saw him run through the path toward the neighboring apartment complex. Johnson and the children got out of the Suburban. Despite being shot during the altercation, Wise was able to get back in his Suburban and attempt to drive away from the scene. Wise did not make it far, however, crashing into a street sign a short distance from where he was shot. Johnson went to check on Wise and saw that he was bleeding from his chest and head. Johnson added that Wise did not have a gun during the altercation and did not ever "raise his arms" like he was getting ready to fire a gun. Johnson testified that he fled the scene because he had an outstanding

7

warrant against him, although he could not remember what it was for. Wise died from his injuries.

According to Benton, when Appellant arrived at the scene, Wise and Appellant "exchanged words" and Appellant pulled out a black gun. Appellant walked toward Wise, hit him with the gun, and "then . . . shot," firing "six to eight shots." Benton got out of her truck and yelled "there [are] children over here, stop shooting." Benton saw Appellant and another man run through "a cut to an apartment" complex. Benton never saw Wise with a gun.

Two other witnesses who were in the area saw the shooting from farther away. One saw the shooting from the back patio of her apartment, from where she could see the driveway of Regina and Appellant's apartment. She heard a gunshot and "looked over" to the driveway. She added that there "was like about six gunshots" and that she saw Wise get shot by a man carrying a black gun. She added that she did not see Wise with a gun. The second witness saw a man walking fast toward Appellant's apartment. He was carrying a black

gun and "just went over there and just unloaded, shooting." From his position, the witness could not see who was shot.

Appellant testified in his own defense at trial. He testified that he had seen Wise pull a gun on Regina before the crimes at issue in this case. The first time was in September 2017. He explained, that, during that incident, Regina and Wise had been arguing and that Wise drove his SUV to Regina and Appellant's apartment, got out, pulled "a gun out of his back pocket," walked up to Regina, and started "cussing her out," while "poking her in the face." Appellant added that there were "other incidents [of] arguing and fussing going on."

According to Appellant, on the night of March 9 to 10, 2018, he and Regina were "relax[ing]" about 1:30 to 2:00 a.m. when they saw Wise park his Suburban near their apartment. Wise began "creeping around" Appellant and Regina's car, and Regina screamed, "get away from my car" and ran out the door. Appellant went outside, and Wise was "cussing [Regina] out" and was arguing with Regina "about stupid stuff." Appellant asked Wise why he was "creeping

9

around [Appellant's] house this time of night." Wise told Appellant that "this ain't got nothing to do with you" and that he did not give an "F about [Appellant's] house." Wise, who was intoxicated, kept "going on" and was talking about how he wanted $3,000. Appellant testified that "there was a lot of arguing"; that Wise kept "putting his hand in [Regina's] face"; and that he eventually "punched her" and "pushed her head back." Wise kept demanding money and told Appellant that he was "going to kill [Appellant]" and that "the police [would] never find [him]." Wise eventually left but called Appellant later that night. Regina recorded that call, and it was played for the jury. During that call, Wise "kept going on" about what had just happened and how he wanted more money from Regina. Appellant told Wise that he did not want any trouble, but Wise said that "he was going to pull up and put one in [Appellant's] face." Appellant testified that Wise called him again about 9:00 a.m. on March 10, saying he wanted his money and "[d]on't make me have to pull up on y'all." Appellant told Wise to stop calling him, that he did not owe Wise any money and did not have $3,000.

Later that morning, when Appellant arrived at his apartment to find Wise there, arguing with Regina, Appellant asked Wise to leave, and the two men started "getting up on each other." Wise then lifted his shirt and "grabbed the handle of his gun." Appellant, at the same time, pulled his gun out of his back pocket. The two men were "in each other's face," and Appellant "backed away" and hit Wise in the head "with the side of [his] weapon." Appellant knocked Wise down, but Wise "stared and looked at [him]"; "got back up"; and came at Appellant. Appellant then "fired in the ground" but Wise "never stopped, he kept coming at [Appellant]." According to Appellant, as Wise was coming towards him, he had his gun "in his hand coming in a forward motion." Appellant fired two shots into the ground and then "blanked" and kept firing. Appellant added that he "had no intention of hurting [Wise], but just trying to prevent him from hurting me. I was going low, and I was leaning back. And as he kept coming, you know, it kept going."

1. Appellant contends that trial counsel provided constitutionally ineffective assistance by failing to subpoena

11

Regina's father, Reginald Welch, as a witness; by failing to procure text messages from Appellant's cell phone; by failing to introduce evidence of Wise's and Johnson's criminal histories; and by failing to request a jury instruction on voluntary manslaughter. We conclude that these claims of ineffective assistance fail.

To establish that his trial counsel was constitutionally ineffective, Appellant must prove both deficient performance by his counsel and resulting prejudice. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Appellant must show that his attorney's acts or omissions were "objectively unreasonable . . . considering all the circumstances and in the light of prevailing professional norms." *Davis v. State*, 299 Ga. 180, 182-183 (787 SE2d 221) (2016). The law recognizes a "strong presumption" that counsel performed reasonably, and the defendant bears the burden of overcoming this presumption. *Strickland*, 466 U.S. at 689. To carry this burden, Appellant must show that "no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did

12

not." *Washington v. State*, 313 Ga. 771, 773 (873 SE2d 132) (2022) (cleaned up). To establish the required prejudice, Appellant must show that but for his attorney's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. See *Davis*, 299 Ga. at 183. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "This burden, though not impossible to carry, is a heavy one." *Ellis v. State*, 292 Ga. 276, 283 (736 SE2d 412) (2013).

(a) Appellant first claims trial counsel was ineffective in failing to subpoena Regina's father, Reginald Welch, as a witness. Appellant contends that Reginald would have testified at trial, as he did at the motion for new trial hearing, that on the morning of the crimes, Wise called him several times and threatened to harm Appellant and Regina.

We conclude, however, that, under the circumstances, counsel reasonably believed that Reginald would testify without a subpoena. As for not subpoenaing Reginald, trial counsel testified at the motion

13

for new trial hearing as follows: "He was a friendly witness. He was my client's girlfriend's father. He had always been cooperative with us. He had always said he would come. We asked him if he needed a subpoena to get off work. He said he did not, so we did not serve him." Moreover, the evidence at the motion for new trial hearing shows that Reginald voluntarily came to court to testify but left the courthouse without informing anyone because he had hurt his foot and was in pain. Here, Reginald was a "friendly," "cooperative" witness who assured trial counsel that he would voluntarily come to testify. Although a subpoena would have guaranteed that Reginald would have stayed in the courtroom, counsel could reasonably have decided that the chance of his not showing up was not worth the risk of antagonizing him by putting him under a court order. That decision was not so unreasonable that no competent attorney would have made it. See *Jernigan v. State*, 357 Ga. App. 415, 431 (848 SE2d 707) (2020) (holding that trial counsel's decision not to subpoena a witness "was reasonable because [the witness] willingly agreed to testify on [the defendant's] behalf without one and counsel had no

reason to believe otherwise"); *Carruth v. Comm'r Alabama Dept. of Corr.*, 93 F4th 1338, 1361 (11th Cir. 2024) (ruling that counsel did not perform deficiently in failing to subpoena witnesses who were part of the defendant's family because "there was nothing to indicate to counsel that subpoenas were needed because they had voluntarily agreed to attend").[4]

(b) Appellant contends that trial counsel was constitutionally ineffective in failing to obtain his cell phone so that text messages on it from Wise to Appellant on the morning of the crimes could have been introduced into evidence.[5] We conclude, however, that Appellant has failed to establish prejudice on this claim.

At one of the hearings on his motion for new trial, Appellant testified that, between the 3:00 a.m. altercation and time of the

---

[4] Appellant does not contend on appeal that trial counsel was deficient in failing to obtain Reginald's testimony once he left the courthouse.

[5] Appellant's contention regarding counsel's investigation into his cell phone is confusing. Because Appellant never offered any evidence that the phone calls from Wise to him about which he testified on motion for new trial were recorded on his phone and does not contend on appeal that recordings of those calls exist, we construe his argument to be that counsel was deficient in failing to introduce evidence of the content of text messages from his phone.

15

crimes, Wise sent him threatening text messages. He specified that, in one of those messages, sent at 11:52 a.m., Wise texted him that he was "gonna smoke [Appellant]" and "kill [him]." Appellant also testified that he informed trial counsel of these messages, that his phone was inside his house, that he told counsel that his phone was in his house, and that he "kept explaining to her to get [his] phone, but she never did get [it]."

At another motion for new trial hearing, appellate counsel asked trial counsel whether the phone records of Appellant would have contained any relevant "text messages" between Appellant and the victim. Trial counsel responded that it would have been necessary to have Appellant's cell phone to access the text messages. Appellate counsel, however, never asked trial counsel whether she ever had access to Appellant's phone or whether Appellant requested that she go to his home and attempt to locate his phone.

We assume without deciding that trial counsel was deficient and conclude that Appellant has failed to carry his burden to show prejudice. As noted above, to satisfy the prejudice prong, Appellant

16

must establish that but for his attorney's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. See *Davis*, 299 Ga. at 183. "This burden, though not impossible to carry, is a heavy one." *Ellis*, 292 Ga. at 283. Additionally, when we are assessing "prejudice from counsel's deficient performance, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have weighed the evidence." *Sharkey v. State*, ___ Ga. ___, ___ (910 SE2d 216, 223) (2024) (cleaned up).

As an initial matter, Appellant did not produce the cell phone or text messages at the motion for new trial hearings. The burden is on a defendant to show prejudice on his ineffective assistance claim, see *Davis*, 299 Ga. at 183; *Ellis*, 292 Ga. at 283, and when a defendant claims that trial counsel was deficient in failing to introduce evidence, part of his burden in demonstrating prejudice is to establish what that missing evidence would have shown. See *Pauldo v. State*, 317 Ga. 433, 437 (893 SE2d 633) (2023) ("It is well established that a defendant fails to establish prejudice under

17

*Strickland* when he merely contends that trial counsel was deficient for failing to present an expert, without also presenting evidence at the motion-for-new-trial hearing about what the potential expert would have testified to at trial."); *Thorpe v. State*, 304 Ga. 266, 268 (818 SE2d 547) (2018) (explaining that "it was [the defendant's] burden to show deficient performance and prejudice through 'competent evidence'" on his ineffective assistance claim).

Moreover, even assuming that the text messages were just as Ryals claimed in his testimony, they were largely cumulative of other testimony. First, Regina, in particular, testified in detail about the confrontation the night before the murder and that, starting with the phone call to Appellant about 5:00 a.m. on March 10 and continuing through the morning, Wise "ha[d] been threatening" Appellant. The jury also heard the phone call that Wise made to Appellant at 5:00 a.m. that morning. In addition, Appellant testified that Wise had threatened to kill him both during the 3:00 a.m. altercation and during phone calls at 5:00 a.m. and 9:00 a.m. that morning. and one neighbor of Appellant's testified that, about 3:00

18

a.m. on March 10, he heard Wise threaten Appellant and Regina. Consistent with the evidence of these threats to Appellant, Regina testified that Wise told her shortly before the shooting that Wise was there "to see that . . . dude of yours dead."

Finally, to the extent that Appellant argues that the missing text messages showed even more explicitly that Wise had recently threatened to kill him, it is unlikely that that extra piece of information would have made a difference in the trial, given the testimony of several witnesses that Appellant was the primary aggressor in the fatal confrontation and the agreement among most witnesses that Wise was not armed. As recounted above, four eyewitnesses, Sarah Freeman, Richard Stephens, Robbie Johnson, and Pamela Benton (Regina's mother) testified that they did not see Wise with a gun, significantly undermining Appellant's testimony that Wise was carrying a handgun "in his hand coming in a forward motion" when Appellant shot him. Also contradicting Appellant's claim regarding Wise's use of a gun was that law enforcement officials did not find a firearm in front of Appellant's apartment

where the shooting occurred or by Wise's Suburban. And Regina testified that Wise did not have a firearm in his hands at the time of the shooting, contradicting Appellant's testimony that Wise was approaching Appellant with his firearm "in his hand" just before Appellant shot him. In addition, Stephens described Appellant as walking fast toward Wise and "just unloading" his gun, and Johnson added that he heard Appellant say to Wise, "Didn't I tell you not to come back over here" and that Appellant then hit Wise with his handgun and shot him multiple times. In this same vein, Benton described seeing Appellant pull out a black gun, walk toward Wise, hit him with the gun, and then fire "six to eight shots" into Wise.

Because Appellant failed to introduce the cell phone or text messages at the motion for new trial hearings, because the text messages would have been largely cumulative of other properly admitted evidence, and because the evidence against Appellant was strong, we conclude that Appellant has failed to carry his heavy burden of establishing that there is a reasonable probability that the result of the proceeding would have been different except for

counsel's alleged deficiency. See *Pauldo*, 317 Ga. at 437 (holding that the defendant failed to show prejudice on his claim that counsel was ineffective in failing to introduce expert testimony because the defendant did not present evidence at the hearing on his motion for new trial regarding what that expert testimony would have been); *Sharkey*, ___ Ga. at ___ (910 SE2d at 223) (holding that appellant failed to establish prejudice on his claim that trial counsel was ineffective in failing to have certain evidence admitted, in part, based on the strength of the evidence against appellant); *Walker v. State*, 301 Ga. 482, 491 (801 SE2d 804) (2017) (holding that appellant failed to establish prejudice on his claim that trial counsel was ineffective in failing to subpoena his brother to testify about appellant's fear of the victim in part because appellant and his father testified on this point); *Ivey v. State*, 305 Ga. 156, 162-163 (824 SE2d 242) (2019) (concluding that defense counsel's failure to present the victim's toxicology report did not prejudice the defendant in part because the report "would have been cumulative of other evidence introduced at trial").

(c) Appellant next contends that counsel was constitutionally ineffective by failing to introduce evidence of Wise's and Johnson's criminal histories. We conclude that this claim fails.

In his amended motion for new trial, Appellant alleged that Wise had a conviction for domestic violence battery arising from an assault on Regina and that Johnson had a "prior criminal history" and admitted that he left the scene of the crime because, at that time, there was an outstanding warrant for his arrest. Appellant alleged that trial counsel was deficient in failing to introduce records of Wise's and Johnson's criminal histories or to cross-examine Regina about Wise's conviction and Johnson about his own. At a motion for new trial hearing, Appellant introduced into evidence a certified copy of Wise's misdemeanor conviction for family violence battery against Regina.[6] Appellant did not introduce evidence of Johnson's criminal history at the motion for new trial hearings and

---

[6] The copy of that conviction is not part of the record on appeal. See *Tedder v. State*, 320 Ga. 29, 41 n.12 (907 SE2d 623) (2024) (explaining that "[a]s a general matter, the appellant bears the burden of ensuring that the appellate record is complete").

did not question trial counsel about the warrant against Johnson that was outstanding at the time of the crimes.

(1) With regard to Appellant's claim that trial counsel was ineffective in failing to introduce Wise's conviction for domestic violence battery or to cross-examine Regina about it, he has failed to show that this prior conviction would have been admissible at trial or that it would have been permissible to cross-examine Regina about Wise's conviction. First, to the extent that Appellant is contending that Wise's conviction shows that Wise had a violent character that was relevant to Appellant's self-defense claim, Appellant could only prove this character trait "by reputation and opinion testimony," and not by use of Wise's prior conviction. See *Ward v. State*, 318 Ga. 884, 902 (901 SE2d 189) (2024) (cleaned up).

Moreover, although "we have held that specific instances of a victim's past conduct may also be admitted, not to show the victim's action in conformity therewith, but rather to establish the defendant's state of mind and the reasonableness of the defendant's use of force," we have also held that "because such evidence is offered

as proof of the defendant's state of mind at the time of the charged crime, it is only admissible if there is proof that the defendant actually knew about the victim's prior acts at that time." Id. at 902 (cleaned up). Accord *Copeland v. State*, 316 Ga. 452, 459 (888 SE2d 517) (2023) (explaining that evidence of a victim's prior conviction "would only have been admissible—and even then, only potentially—to show [the defendant's] state of mind at the time of the shooting and the reasonableness of his use of force. And it could have been admissible for that purpose only upon a showing that [the defendant] actually knew about the past crimes at the time of the shooting").

Here, Regina described prior violence committed by Wise against her and added that Appellant was aware of "the prior violence." We need not decide whether her testimony was sufficient to satisfy the admissibility requirements for Wise's prior conviction, because even assuming that it was, and even assuming that trial counsel was deficient in failing to use Wise's conviction at trial, Appellant has failed to establish prejudice on this claim. To begin,

we know that Wise's misdemeanor conviction was for domestic violence against Regina, but Regina and Appellant testified about domestic violence committed by Wise against Regina. Regina testified that on the night of March 9 to 10, Wise "punched [her] in [her] face," and that, during earlier incidents, Wise had "smushed [her] face," "grazed [her] face," and threatened to "shoot [her] house up." Appellant also testified that he previously had seen Wise "pull[ ] a gun out of his back pocket," walk up to Regina, and start "cussing her out," while "poking her in the face." Because evidence of a misdemeanor domestic violence conviction would have been cumulative of other evidence of domestic violence introduced at trial and because, as explained in Division 1 (b) above, the evidence against Appellant was strong, we conclude that Appellant has failed to establish that but for counsel's assumed deficiency, the result of the trial would have been different. See *Sharkey*, ___ Ga. at ___ (910 SE2d at 223); *Ivey*, 305 Ga. at 162-163.

(2) As for the warrant that existed against Johnson at the time of the crimes, Appellant appears to argue that trial counsel was

25

ineffective in failing to cross-examine Johnson about any bias that Johnson might have had in testifying for the State arising from that warrant. However, Appellant failed to introduce any evidence at the hearings on the motion for new trial about the charges and circumstances that led to the issuance of the warrant against Johnson or any evidence regarding whether that warrant was still outstanding at the time of trial. Appellant therefore offers nothing more than speculation that cross-examination regarding the warrant would have shown Johnson's bias in testifying. See *Sauder v. State*, 318 Ga. 791, 812 (901 SE2d 124) (2024) (holding that counsel did not perform deficiently in failing to cross-examine a witness about bias in testifying for the State where the evidence showed that the charge in question was no longer pending at the time of trial); *Monroe v. State*, 315 Ga. 767, 783 (884 SE2d 906) (2023) (rejecting claim that trial counsel was ineffective in not exploring a witness's deal with the State where the defendant did not introduce evidence on motion for new trial to support his claim that deal existed, explaining that "mere speculation will not support

26

a claim of ineffective assistance of counsel"). See also *Moore v. State*, 315 Ga. 263, 269 (882 SE2d 227) (2022) (explaining that "[t]he scope of an attorney's cross-examination is grounded in trial tactics and strategy, and will rarely constitute ineffective assistance of counsel" (cleaned up)).

Similarly, Appellant also failed to show that Johnson had any prior convictions or that, if he did, they would have been admissible under OCGA § 24-6-609 for impeachment purposes. For these reasons, Appellant has failed to show that trial counsel performed deficiently in failing to introduce evidence regarding those alleged convictions. See *Monroe*, 315 Ga. at 783-784 (rejecting claim that counsel was ineffective in failing to impeach a witness with prior convictions where the defendant failed to put forward any evidence on motion for new trial that the witness had any prior convictions); *Wofford v. State*, 305 Ga. 694, 697 (827 SE2d 652) (2019) (holding that trial counsel was not deficient in failing to impeach witnesses with prior convictions where the defendant at the hearing on motion for new trial failed to offer evidence of any prior convictions as to one

witness and failed to show that certain prior convictions of another witness would have been admissible under OCGA § 24-6-609).

(d) Appellant contends that trial counsel was ineffective by failing to request a charge on voluntary manslaughter. We conclude that this claim has no merit.

At a motion for new trial hearing, trial counsel testified that she was "certain" that she had discussed whether to request a voluntary manslaughter charge with Appellant and that it was "an intentional and strategic decision" not to request the charge because "[w]e were trying for not guilty." On cross-examination, counsel reiterated that she did not request a charge on voluntary manslaughter "[b]ecause it would have given the jury the option to compromise and give [Appellant] a significant amount of time in a case where were we arguing for self-defense." Appellant, on the other hand, testified at one of the hearings on the motion for new trial that trial counsel never discussed the possibility of requesting a voluntary manslaughter charge with him and that such a charge should have been one of his defenses. In denying Appellant's motion

for new trial, the trial court found that trial counsel's testimony was more credible than Appellant's regarding whether counsel had discussed with Appellant the decision not to request a voluntary manslaughter charge. The court also concluded that counsel's decision was a matter of trial strategy.

Here, the record shows that counsel and the defendant discussed the all-or-nothing strategy of pursuing only a claim of self-defense, with counsel testifying that "we were trying for a not guilty." That strategy was reasonable under the circumstances of this case, as the claim of self-defense was supported by some evidence at trial. Appellant, for example, testified that, during the altercation that led to Wise's death, Wise pulled his gun out of his back pocket, came at Appellant with his gun "in his hand coming in a forward motion," and Appellant shot Wise "to prevent him from hurting me." Counsel's decision not to request a voluntary manslaughter charge, which would have undermined the all-or-nothing defense, was not patently unreasonable. See *Rosenbaum v. State*, 320 Ga. 5, 12 (907 SE2d 593) (2024) (holding that trial

29

"counsel's choice to rely solely on the defense of accident, and not to request a jury charge on justification, was not so patently unreasonable that no competent attorney would have made that choice"). Although Appellant contends that trial counsel failed to consult with him about whether to pursue a voluntary manslaughter charge, the trial court found that trial counsel did consult with Appellant about that matter, and that finding is not clearly erroneous. See *Powell v. State*, 309 Ga. 523, 526-527 (847 SE2d 338) (2020) (explaining that we "accept[ ] a trial court's factual findings and credibility determinations on an ineffectiveness claim unless they are clearly erroneous"). For these reasons, Appellant's claim of ineffective assistance of counsel fails.

2. Appellant contends that the cumulative effect of trial counsel's four instances of allegedly deficient performance affected the outcome of the trial. See *Schofield v. Holsey*, 281 Ga. 809, 811 n.1, (642 SE2d 56) (2007), overruled on other grounds by *State v. Lane*, 308 Ga. 10, 23 (838 SE2d 808) (2020). In Division 1, we assumed two instances of the deficient performance of counsel and

held that Appellant failed to establish that either assumed instance of deficient performance prejudiced his defense. Appellant also has not shown that these two assumed deficiencies, considered together, created a reasonable probability that the results of the proceeding would have been different in their absence. Accordingly, his claim of cumulative prejudice fails. See *Vendrel v. State*, 318 Ga. 233, 244 (897 SE2d 751) (2024).

*Judgment affirmed. All the Justices concur.*